IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

TERESA A. BEASLEY,                    )
                                      )
            Plaintiff,                )
                                      )
                                      )      CIV-11-559-W
v.                                    )
                                      )
MICHAEL J. ASTRUE,                    )
  Commissioner of Social Security     )
  Administration,                     )
                                      )
            Defendant.                )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her application for disability insurance benefits under Title

II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1382.  Defendant has

answered the Complaint and filed the administrative record (hereinafter TR___), and the

parties have briefed the issues.   The matter has been referred to the undersigned Magistrate

Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).   For the following

reasons, it is recommended that the Commissioner's decision be affirmed.

I. Background

On June 3, 2008 (protective filing date), Plaintiff filed her application for benefits and

alleged that she became disabled on January 18, 2007. (TR 112-114).  At that time, Plaintiff was 48 years old.  As her disabling impairments, Plaintiff described chronic post concussion syndrome, cerebral function disturbance, cervical spine disc dislocation, major depression, severe and chronic shoulder, neck, back, chest and hip pain from on-the-job injury occurring January 18, 2007, severe migraine headaches, dizziness, nausea, and short term memory loss. (TR 142, 150).  She described previous work from 1991 until January 2007 as an executive administrative assistant. (TR 143-144).  In later responses to administrative questionnaires, Plaintiff described a long list of symptoms.  She stated that in approximately May 2005 she experienced: migraine headaches "several times per month" with sensitivity to light and sound, "head pain daily," "dizziness at all times," "neck pain daily," "muscle spasms in [her] neck, shoulder, back, and legs," "pain in [her] left hip and righ[t] shoulder especially," decreased appetite, nausea, vomiting, "limited range of motion" in her neck, ringing in her left ear, frequent constipation, "tingling" in her lower back, inflammation in her neck, and "sad thought, crying [sic]." (TR 174).  She stated in approximately May 2008 she experienced: a "limited" ability to lift and "ha[d] been given restrictions," "difficulty lifting [because] of pain [in her] neck, back shoulders, and left hip," "limited" ability to walk, she "[held] onto someone else for support when walking when [she is] outside the house" due to a "fear [of] falling," she "stumble[d] often," she "risk[ed] a syncope episode the longer [she was] on [her] feet," and she was "limited" in her ability to sit. (TR 174).

Plaintiff's application was denied on administrative review. (TR 58, 59, 63, 69).  At Plaintiff's request, a hearing *de novo* was conducted before Administrative Law Judge

Shepherd on July 14, 2009. (TR 28-57).  At this hearing, Plaintiff, who appeared with counsel,  testified she had a high school equivalency education and had completed some college courses, she did not use an assistive device, and she could not work due to severe headaches, chronic neck and "thoracic cavity" pain, severe muscle spasms, severe burning from her neck down to her lower back, inability to turn her head, daily dizziness and nausea, and lack of balance. (TR 35-37).  Plaintiff attributed her pain and other symptoms to a work-related accident in which she slipped and fell on ice while walking to her job on January 18, 2007.  She stated she had not worked or driven since that date. (TR 36, 45).  Plaintiff stated that she was generally confined to her home in a recliner, that she performed no household maintenance chores due to pain in her head, neck, and chest, and she spent her days "sleeping mostly all the time" due to the side effects of her medications, including five daily doses of Neurontin, an anti-seizure medication also used to treat neuralgia, or nerve pain.[1] (TR 40, 43, 46, 47).  Plaintiff stated she could take care of her personal needs and fix light meals for herself. (TR 45).  Plaintiff estimated that she slept five to six hours per night and five to six hours during the day. (TR 49).  She used an electric cart when grocery shopping, read her Bible, watched television, and occasionally attended church. (TR 47, 49-50).  She estimated that as a result of her dizziness, nausea, and pain she could sit 30 minutes, stand 40 minutes, walk ½ block, and she could not bend, squat, or climb stairs. (TR 37, 41-43).

A vocational expert ("VE") also testified at the hearing.  The ALJ subsequently issued

---

[1] http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/.

a decision on August 25, 2009, in which the ALJ found that Plaintiff had severe impairments but that she was capable of working, and the ALJ therefore denied her application for benefits. (TR 15-27).  The Appeals Council considered the record and additional evidence submitted by Plaintiff but declined to review this decision (TR 1-5).

II. <u>Standard of Review</u>

Plaintiff now seeks judicial review of the final decision of the Defendant Commissioner embodied in the ALJ's determination.  Judicial review of a decision by the Commissioner is limited to a determination of whether the Commissioner's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  <u>Wilson v. Astrue</u>, 602 F.3d 1136, 1140 (10th Cir. 2010); <u>Doyal v. Barnhart</u>, 331 F.3d 758, 760 (10th Cir. 2003).  The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole.  Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." <u>Wall v. Astrue</u>, 561 F.3d 1048, 1052 (10th Cir. 2009)(citations, internal quotation marks, and brackets omitted).   In an appeal of an administrative decision, the court must rely on the conclusions drawn by the ALJ and may not "create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." <u>Haga v. Astrue</u>, 482 F.3d 1205, 1207-1208 (10th Cir. 2007).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i).  The Commissioner follows a five-step sequential evaluation procedure to determine whether a claimant is disabled. Doyal, 331 F.3d at 760. In the first four steps of this process, the claimant has the burden of establishing a prima facie case of disability. Id.  In this case, Plaintiff's claim was denied at step five.  At the fifth and final step of the requisite sequential evaluation process, the burden shifts to the Commissioner "to show that the claimant retains sufficient [residual functional capacity] . . . to perform work in the national economy, given her age, education and work experience." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)(internal quotation and citation omitted).

III. Medical Record

The relevant medical record in this case begins with a hospital emergency room ("ER") report dated January 18, 2007.  The examining physician, Dr. Reames, noted that Plaintiff, who was then 47 years old, had slipped on the ice and hit the back of her head.  (TR 297).  She complained of pain in her lower back and left hip, and she was brought to the ER by ambulance.  A physical examination revealed some lumbar spinal and left hip tenderness, but otherwise nothing abnormal. (TR 297).  Dr. Reames noted a computerized tomographic ("CT") scan of Plaintiff's head as well as x-rays of her lumbar spine and left hip were normal, and she was released with prescriptions for pain and muscle relaxant medication and advised not to return to work until the following Monday. (TR 298).  The following day Plaintiff returned to the ER complaining of persistent headache, neck discomfort, and

dizziness. (TR 295).  A physical examination was again unremarkable, and the examining physician, Dr. Mayo, noted that Plaintiff's symptoms suggested a post-concussive syndrome and cervical strain, for which she was prescribed pain, muscle relaxant, and anti-nausea medications. (TR 295-296).  Dr. Mayo noted that CT scans of Plaintiff's head and cervical spine were normal.  (TR 295).

On January 23, 2007, Plaintiff was examined by Dr. Conrady, who noted Plaintiff stated she was planning to remarry her husband and needed a medical check-up. (TR 240). She described the previous fall and treatment for a concussion and indicated her back was still bothering her and she was having "concussion headaches." (TR 240).  Dr. Conrady advised her that her fall-related injuries would be treated by other physicians under her state employer's workers' compensation insurance provider.  Dr. Conrady obtained Plaintiff's medical history, conducted a physical examination, and prescribed narcotic pain medication for Plaintiff's report of pain associated with a previous left ankle fracture and surgery in 2005.  (TR 238-240).

In February 2007, Plaintiff was examined by Dr. Hinz, who noted that she drove to the clinic for her appointment and she complained of constant headaches, mild cervical, lumbar, and left hip discomfort, and difficulty concentrating. (TR 224).  Dr. Hinz noted that Plaintiff was progressing well in physical therapy and that CT and x-ray tests of her head, lumbar spine, and left hip were all negative. (TR 224).  (See TR 219, 221, 222). A physical examination was normal. (TR 224).  She was referred to a neurologist for treatment of her post-concussion syndrome. (TR 224-225).

6

In February 2007, Plaintiff was evaluated by Dr. Kaplan, a neurologist. (TR 214-217; repeated at 592-595). She complained of persistent headaches, neck pain radiating into her shoulders, dizziness, nausea, blurry vision, difficulty sleeping, depression, and irritability. (TR 214). She gave a history of hypertension. (TR 214). Dr. Kaplan conducted a neurological examination, which was normal. (TR 215-216). Dr. Kaplan suggested that magnetic resonance imaging ("MRI") testing of Plaintiff's brain and cervical spine was needed to rule out other injuries, and he adjusted Plaintiff's medications to treat her postconcussion syndrome and posttraumatic neck pain. (TR 216).

In a follow-up evaluation three weeks later, Dr. Kaplan noted that MRI testing of Plaintiff's brain was normal and that MRI testing of her cervical spine revealed a small focal left disc protrusion at one level and mild cervical spondylosis. (TR 212). (See TR 202-204). A neurological examination was normal. (TR 212). Dr. Kaplan adjusted Plaintiff's medications, prescribed physical therapy, and prescribed anti-inflammatory medication for her neck and back pain symptoms. (TR 212-213). In a follow-up evaluation in March 2007, Dr. Kaplan noted Plaintiff denied any side effects from her medications, which included an anti-depressant medication prescribed by another physician. (TR 210). Although Plaintiff indicated her pain had improved, she complained of recurrent headaches and symptoms of dizziness and neck pain. (TR 210). A neurological examination was normal, and her medications and physical therapy were continued. (TR 210-211; repeated at 590-592).

Plaintiff was evaluated by Dr. Remondino, a neurosurgeon, for workers' compensation purposes in April 2007. (TR 577-580). After noting he had reviewed her

medical records and further noting the results of a physical examination, Dr. Remondino reported that Plaintiff had a closed head injury and cervical strain with multiple-level cervical disc charges but had no injury that required "surgical intervention." (TR 577-579).   He recommended, but Plaintiff declined, epidural steroid injections. (TR 579).

At her next follow-up evaluation by Dr. Kaplan in April 2007, Plaintiff reported  Dr. Remondino had recommended a trial of cervical epidural steroid injections, and Dr. Kaplan noted he concurred this treatment would be appropriate. (TR 208).   Dr. Kaplan noted a neurological examination was again normal, and he encouraged Plaintiff to return to work. However, he noted Plaintiff stated she could not work and was "quite distraught" about her condition. (TR 208).

Plaintiff was referred to Dr. Johnson for a neuropsychiatric evaluation, and an MRI study of her lumbar spine was recommended due to her complaints of persistent low back pain. (TR 208-209; repeated at 584-585).  In a follow-up evaluation in May 2007, Plaintiff reportedly advised Dr. Kaplan that she had undergone steroid injections conducted by Dr. Mitchell, but that the steroid injections did not reduce her neck pain. (TR 206).  Plaintiff complained of "chronic headaches along with numerous other symptoms including dizziness, difficulty sleeping, constipation, and depressed mood." (TR 206).   Dr. Kaplan advised Plaintiff to seek treatment from a pain management specialist and prescribed muscle relaxant and anti-inflammatory medications. (TR 206-207; repeated at 582-583).

Plaintiff was evaluated by Dr. Moorad, a rehabilitation and occupational medicine specialist, in June 2007. (TR 248-251; repeated at 554-557).  Dr. Moorad noted Plaintiff

8

complained of "10/10" pain that was "burning, stabbing and aching . . . all over her entire body except for her abdomen, breasts and buttocks." (TR 249). She described difficulty concentrating and headaches and stated she was "taking lots of [narcotic pain medication] without any relief," although she was doing water physical therapy. (TR 249). Dr. Moorad noted a physical examination was normal except for some tenderness in her neck and lumbar spine and that her dizziness symptoms were improving. (TR 250). He noted that she had multi-level spondylitic and cervical degenerative disc disease that was pre-existing and aggravated by her slip-and-fall injury. (TR 250). The physician noted that "[b]ecause of the severity of her diffuse symptomatology and her level of anxiety at the present time and the tremendous amount of focusing on her somatic complaints, [she was considered temporarily disabled] . . . until the next visit." (TR 250). Her medications were adjusted, and Plaintiff was advised to "exercise, stretch, do anything possible to increase her flexibility . . and walk more and be more mobile." (TR 251).

In a follow-up evaluation in July 2007, Dr. Moorad noted (TR 245-247; repeated at 551-553) that Plaintiff had no "neurological impingement, no spinal stenosis or other significant issues," only "mild post-concussive headaches with minimal dizziness" which had been "treated and is resolving," but she complained of a stiff and painful neck and muscle spasms. (TR 245). Dr. Moorad noted she had "lots of very unusual" symptoms and that in a previous psychological evaluation of Plaintiff conducted by Dr. Ozolins in June 2007 the psychologist reported Plaintiff's test results were "invalid because of numerous inconsistencies during testing," that Plaintiff "was using her pain complaints to manipulate

others," that Plaintiff had "chronic somatization" and a "long standing history of exaggeration of problems, even before her injury," and that she exhibited "clearly a strong malingering component in her testing." (TR 245). Dr. Moorad noted a physical examination of Plaintiff was unremarkable, that Plaintiff's pain responses were "out of proportion to what should be found clinically," and that Plaintiff's "psychological and behavioral issues" would make treating her problematic. (TR 246; repeated at 552). He noted he advised Plaintiff she must attend physical therapy, do her home exercises, take her prescribed medications, which she had stopped taking without notifying the physician, and return for follow-up treatment. (TR 245-246).

Eight days later, Plaintiff was treated at a hospital ER after she reportedly became dizzy (but did not lose consciousness) while walking and fell during a physical therapy session. (TR 285-286). The examining physician noted that a physical examination and all testing, including a CT scan of Plaintiff's head, were normal, that she had suffered only a cervical and lumbar strain during a fall, and that Plaintiff was prescribed anti-anxiety medication. (TR 285-286). Ten days later, a physical therapist reported that Plaintiff was discharged from treatment for noncompliance, that she complained of diffuse, severe, chronic pain throughout her body, but that she showed "poor" tolerance to treatment. (TR 288-289).

Plaintiff's primary care physician, Dr. Conrady, referred her to Dr. Linden for treatment of anxiety. (TR 355). Dr. Conrady also authored a note dated August 23, 2007, in which he stated "To Whom It May Concern" that Plaintiff was "still unable to work" and "qualifie[d] for shared leave." (TR 356). In August 2007, Plaintiff was evaluated by Dr.

Linden, a psychiatrist. (TR 242-244). Dr. Linden noted Plaintiff complained of chronic pain, worsening depression, difficulty recalling information, increasing anger and irritability, and excessive worry that interfered with her sleep. (TR 242). She was taking blood pressure, anti-depressant, anti-anxiety, anti-nausea, and anti-inflammatory medications. (TR 243). Dr. Linden conducted a mental status examination and diagnosed Plaintiff with a single episode of moderate depression and anxiety disorder, for which he prescribed anti-depressant and sleeping aid medications and advised Plaintiff to continue taking two other previously-prescribed anti-depressant and anti-anxiolytic medications. (TR 244). A week later Plaintiff returned to Dr. Linden and reported she was sleeping better and that the anti-anxiety medication was effective. (TR 241). Her medications were adjusted, although Dr. Linden noted normal findings on a mental status examination. (TR 241).

On September 11, 2007, Plaintiff was evaluated in connection with her workers' compensation claim by Dr. Ellis. (TR 252-257). Dr. Ellis noted that as a result of her on-the-job injury and "psychological overlay with depression due to chronic pain from this injury" Plaintiff needed further pain management treatment and might require vocational rehabilitation with job placement. (TR 256).

Ten days later, Plaintiff was seen by her primary care doctor, Dr. Conrady, who noted Plaintiff complained that she was dizzy. Dr. Conrady also noted that he spoke with Plaintiff extensively concerning "how she had an attitude where she was just scared of everything and she just needed to have some reassurance" and that he attempted a test to elicit dizziness "and show nystagmus and they were not present." (TR 348). Dr. Conrady noted he helped

Plaintiff get off the examining table and asked his nurse to assist Plaintiff walk to the front desk but that as she turned the corner out of the examining room Plaintiff "started going down" and his nurse "let her down very slowly onto the ground, [but] she never actually fell." (TR 348). Subsequently, Dr. Conrady noted Plaintiff called his office and complained that she had "ruptured" her hernia when she "fell" at his office and she was "upset that we let her get up and walk by herself out of the room." (TR 348). Dr. Conrady noted in October 2007 that there was no objective evidence of a hernia, and a CT scan of Plaintiff's abdomen was interpreted as normal. (TR 340, 346).

In December 2007, Plaintiff sought treatment at a hospital ER after she reported she had experienced a "near syncopal episode" at a restaurant after experiencing dizziness while shopping "and was lowered to the floor by a cafeteria waitress. She did not fall." (TR 280-281). The examining physician noted a physical examination and EKG testing were unremarkable and Plaintiff was given anti-anxiety medication and discharged. (TR 280-281; repeated at 410-411).

Plaintiff returned to Dr. Linden for follow-up psychiatric treatment in January 2008, where she reportedly described experiencing "another syncopal episode" at a restaurant and being "physically abused" by ambulance personnel. (TR 487). Dr. Linden noted no abnormalities in a mental status examination and continued her medications. (TR 487). However, in a follow-up examination in January 2008, Dr. Linden noted Plaintiff was "traumatized" by her treatment by the ambulance personnel and that she was suffering post-traumatic stress disorder as a result of being "spoken to in a very harsh and demeaning

manner." (TR 486).

In February 2008, Plaintiff was referred by the workers' compensation court to Dr. Johnsen, a clinical psychologist, for evaluation and treatment. (TR 318-321). Dr. Johnsen's report includes a thorough review of the medical record of Plaintiff's treatment and examinations, including the ambulance company's report of her initial injury, her initial treatment at Mercy Health Center, and the reports of Dr. Kaplan, Dr. Remondino, Dr. Mitchell, Dr. Moorad, Dr. Ozolins, and Dr. Linden. Plaintiff complained of migraine headaches with vomiting, burning pain in her neck, spasms in her thoracic cavity, spinal pain, pain that "move[d] around her body without warning," lack of balance, numbness from the waist down, anxiety, depression, irritability, poor anger control, and restlessness. (TR 319). After conducting a mental status examination and objective behavioral testing, Dr. Johnsen reported that Plaintiff was "greatly exaggerating the extent to which she is suffering from both physical and psychological problems as a result of her January 18, 2007 work-related injury," that she was not experiencing post-traumatic stress disorder as found by Dr. Linden, and that she could benefit from short-term pain management counseling "addressing the cognitive distortions that she has developed with respect to her injuries and pains [and to help her] manage her pain without automatically turning to an assortment of medications." (TR 320).

In February 2008, Plaintiff returned to Dr. Linden where she reportedly complained of being "disappointed" by Dr. Conrady and exhibited anger toward her former employer. (TR 482). In March 2008, Dr. Linden noted Dr. Kaplan had refused to provide further

treatment of Plaintiff and that she was seeing a therapist in Dr. Johnsen's office. (TR 481).

In April 2008, Dr. Linden noted Plaintiff had received a letter from another physician

terminating his treatment of her and that this "to some extent has been a pattern that she has

also experienced with other physicians . . . ." (TR 480).

In March 2008, Plaintiff was again referred to Dr. Moorad by the workers'

compensation court for pain management and treatment.  Plaintiff reported she had not

received medical treatment for over seven months and "she is very upset about that." (TR

548).  Dr. Moorad conducted a physical examination and assessed Plaintiff with "cervical

discogenic syndrome with off and on radicular pain and secondary discogenic headaches"

and that she needed to continue her psychological counseling and "a maintenance program,

home exercise program and to adhere to her pain management contract." (TR 549).  She was

prescribed pain, muscle  relaxant, anti-inflammatory, and sleeping aid medications, a

"TENS" unit, and advised to return for follow-up treatment in three months. (TR 549).

In April 2008, Plaintiff sought treatment from a new primary care doctor, Dr. Morgan,

who noted Plaintiff stated she had been terminated from her employment in February 2008

and she was experiencing balance problems, vertigo, chronic pain, and depression. (TR 331).

The diagnostic impression was vertigo and dysequilibrium.  Neurontin was prescribed. (TR

332).    In May 2008, Dr. Morgan noted that Plaintiff complained of severe neck, left

shoulder, and sternum pain, and she complained that her treating pain management specialist

was "working against her." (TR 326).  Dr. Morgan noted a physical examination was

unremarkable and that he prescribed pain medications. (TR 327).  In a follow-up examination

in June 2008, Plaintiff reported she was dizzy and that the Neurontin had not reduced her headaches. (TR 322). Dr. Morgan noted Plaintiff was anxious and somewhat histrionic, her medications were adjusted, and she was given back exercises. (TR 323).

In June 2008, Plaintiff was evaluated for workers' compensation purposes by Dr. Banowetz, a neurologist. Dr. Banowetz noted he reviewed her medications and that Plaintiff complained of daily headaches, for which he prescribed medication, and burning in her neck. (TR 457). She was advised to return in two months.

In June 2008, Plaintiff returned to Dr. Moorad for follow-up treatment. A physical examination was unremarkable, and she was advised to continue her home exercise program and increase her stretching, walking, and exercise. She was prescribed five medications. (TR 545). In September 2008, Plaintiff returned to Dr. Moorad. (TR 541-543). Dr. Moorad noted she denied depression, anxiety, chest pain, dizziness, or nausea. (TR 541). Dr. Moorad noted a physical examination showed no abnormalities, that he advised Plaintiff to continue her exercise and walking program, and that he prescribed pain, muscle relaxant, and anti-inflammatory medications for Plaintiff. (TR 541-542).

In September 2008, Plaintiff returned to Dr. Linden for follow-up psychiatric treatment. (TR 624). She reportedly exhibited no abnormalities on mental status examination and her medications were continued. (TR 624). There are notes of monthly visits by Plaintiff to Dr. Linden for follow-up treatment from October 2008 through June 2009. (TR 625-638). In March 2009, Dr. Linden noted Plaintiff reported she was caring for her mother-in-law who had end-stage renal disease. (TR 634). Dr. Linden noted in May 2009 that her behavior was

stable and that Plaintiff reported she was "doing fairly well and denie[d] any significant difficulties."  (TR 636).

The record includes a report of a consultative examination of Plaintiff for her workers' compensation attorney by Dr. Blough conducted in September 2008. (TR 643-651).  Dr. Blough opined that Plaintiff was not capable of performing her previous job but that she was an "excellent candidate for vocational rehabilitation to help train her in a job consistent with her physical limitations and help her find suitable employment." (TR 650).  However, in his check-marked responses on a questionnaire completed in July 2009 addressing Plaintiff's residual functional capacity ("RFC"), Dr. Blough stated that Plaintiff would need to lie down two to three times per day during a work shift and that she would be absent from work about three times per month. (TR 641-642).

In June 2009, Plaintiff returned to Dr. Morgan for follow-up care and stated she experienced pain "all of the time" in her back and neck, was not able to turn her head without severe pain, had frequent chest pain with breathing or coughing, and was not able to exercise because of pain. (TR 619-620).  There were no abnormalities noted on physical examination. (TR 620-621).  Dr. Morgan prescribed 1800 milligrams of Neurontin per day as treatment for Plaintiff's chronic pain and headaches. (TR 622).

## IV. ALJ's Decision

At step one of the established sequential evaluation procedure, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 18, 2007, her alleged disability onset date. (TR 17).  At step two, the ALJ found that Plaintiff had severe

impairments due to a back disorder, affective mood disorder, and status post concussion. (TR 17).   At the third step, the ALJ found that Plaintiffs' severe impairments, considered individually or in combination, did not satisfy or medically equal the requirements of an impairment deemed disabling *per se* under the agency's Listing of Impairments.   In connection with this finding, the ALJ evaluated the severity of Plaintiff's mental impairment under the criteria of Listing 12.04 and also considered the requirements of listings for musculoskeletal impairments and seizure disorders. (TR 17-19).   At step four, the ALJ provided an extensive summary of the relevant medical record and found that despite her impairments Plaintiff had the residual functional capacity ("RFC") to perform the requirements of light work with some additional restrictions. (TR 19-25).   The ALJ found that Plaintiff's ability to perform light work was limited to work involving no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (TR 19).   Further, Plaintiff could "understand, remember, and carry out [work involving no more than] simple, routine, and repetitive tasks" and that she could "respond appropriately to supervision, co-workers, the general public, and usual work situations." (TR 19).   The ALJ further found that this RFC for work precluded the performance of Plaintiff's previous work as an administrative assistant.   At the fifth and final step, and considering Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act because there are jobs available in the economy which she could perform, including the jobs of bench assembler, photofinishing counter clerk, and furniture rental clerk. (TR 26).

V. Treating Physician's Opinion

Plaintiff's treating psychiatrist, Dr. Linden, completed a mental residual functional capacity questionnaire dated July 13, 2009, in which Dr. Linden expressed his diagnosis and clinical findings concerning Plaintiff's mental impairment and placed check marks on the form identifying multiple "signs and symptoms" exhibited by Plaintiff, including decreased energy, feelings of guilt or worthlessness, mood disturbance, recurrent and intrusive recollections of a traumatic experience, change in personality, easy distractibility, and sleep disturbance. (TR 653-654).   In the portion of the form relating Plaintiff's "mental abilities and aptitudes needed to do unskilled work," the form required the psychiatrist to indicate with check marks whether Plaintiff's abilities in certain areas would be either "[u]nlimited or very good," "[l]imited but satisfactory," "[s]eriously limited but not precluded," or "[u]nable to meet competitive standards." (TR 655).   Dr. Linden marked "[u]nable to meet competitive standards" with respect to the abilities to "[m]aintain regular attendance and be punctual within customary, usually strict tolerances," "[s]ustain an ordinary routine without special supervision," "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms," "[p]erform at a consistent pace without an unreasonable number and length of rest periods," and "[r]espond appropriately to changes in a routine work setting." (TR 655).   Dr. Linden marked "[s]eriously limited, but not precluded" with respect to the abilities to "[m]aintain attention for two hour segment," "[g]et along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes," and "[d]eal with normal work stress." (TR 655).   Dr. Linden marked either

unlimited abilities or satisfactory abilities to "[r]emember work-like procedures," "[u]nderstand and remember very short and simple instructions," "[c]arry out very short and simple instructions," "[w]ork in coordination with or promixity to others without being unduly distracted," "[m]ake simple work-related decisions," "[a]sk simple questions or request assistance," " [a]ccept instructions and respond appropriately to criticism from supervisors," and "[b]e aware of normal hazards and take appropriate precautions." (TR 655). Dr. Linden further indicated on the form that Plaintiff's "impairments or treatments" would cause her to be absent from work more than four days per month and that Plaintiff's "psychiatric condition exacerbate[d her] experience of pain or any other physical symptom." (TR 656-657).

In the ALJ's decision, the ALJ expressly considered Dr. Linden's written RFC assessment. The ALJ opined that most of the findings on the form were not consistent with Dr. Linden's treatment records and that he had given only "some weight as appropriate" to the opinion. (TR 24). Specifically, the ALJ reasoned that

> there is no corresponding objective evidence in the treating records that the claimant would have problems with attendance, sustaining routine, responding to changes in a routine work setting, or completing a normal workday and workweek without interruption. Of interest, Dr. Linden found the claimant had no limitation in understanding, remembering, and carrying out very short and simple instructions; maintaining socially appropriate behavior; and adhering to basic standards of neatness and cleanliness . . . . It is strongly probative that in his treating medical records, Dr. Linden did not give the claimant limitations or restrictions. The findings of Dr. Linden have been considered and given some weight as appropriate; those which are consistent with the overall evidence have been incorporated into

the determination of the claimant's [RFC].

(TR 24).

Plaintiff contends that this analysis is flawed for a number of reasons.  First, Plaintiff contends that the ALJ should have recontacted Dr. Linden for clarification if he could not decipher Dr. Linden's hand-written notes (the ALJ noted in the decision, and the undersigned concurs, that Dr. Linden's "handwritten notes are difficult to read")(TR 24)) and that the ALJ should have discussed Dr. Linden's diagnostic assessment and clinical findings, including the assessment of current GAF score[2] of 50.

Plaintiff contends that the ALJ erroneously rejected certain portions of Dr. Linden's RFC assessment due to the absence of objective medical evidence of Plaintiff's work-related limitations in the record.  See Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)(Commissioner erred by relying on "the *absence of contraindication* in the medical records" in determining claimant's RFC for work).  The ALJ did not err, however, in considering whether Dr. Linden's RFC assessment was supported by the relevant evidence and consistent with the record as a whole.  See Watkins, 350 F.3d at 1301 (setting forth factors to be considered in assessing weight to be given treating physician's opinion).

_____

[2]The diagnosis of mental impairments "requires a multiaxial evaluation" in which Axis I "refers to the individual's primary clinical disorders that will be the foci of treatment," Axis II "refers to personality or developmental disorders," Axis III "refers to general medical conditions," Axis IV "refers to psychosocial and environmental problems," and Axis V "refers to the clinician's assessment of an individual's level of functioning, often by using a Global Assessment of Functioning (GAF), which does not include physical limitations." Schwarz v. Barnhart, No. 02-6158, 2003 WL 21662103, at *3 fn. 1 (10th Cir. July 16, 2003)(unpublished op.)(citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM IV)(4th ed. 1994), pp. 25-32).

With respect to the GAF score included in Dr. Linden's RFC assessment, a GAF score of 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV, at 34. It appears from the form completed by Dr. Linden, although he does not expressly indicate this, that he based the GAF score on his assessment of Plaintiff's social or occupational functioning. Because Dr. Linden continued in the RFC assessment to specifically indicate his opinion concerning Plaintiff's social or occupational functional abilities in various areas, which were addressed by the ALJ in his decision, the ALJ did not err in failing to expressly consider the one-time GAF rating set forth in the treating psychiatrist's RFC assessment. Nor was the ALJ required to recontact Dr. Linden with respect to the initial diagnostic assessment and clinical findings, none of which are inconsistent with the ALJ's finding that Plaintiff has a severe mental impairment due to an affective disorder.

There is substantial evidence in the record to support the ALJ's finding that Dr. Linden's treatment records are not consistent with his findings on the RFC assessment that Plaintiff would be severely limited or unable to perform numerous mental work-related functions. In his treatment records, Dr. Linden occasionally noted that Plaintiff's mood was "dysphoric" on mental status examination. (TR 486, 492, 627, 637). However, Dr. Linden's treatment records do not include findings that Plaintiff exhibited or was experiencing significant functional limitations caused by her mental impairment. In February 2009, for instance, Dr. Linden noted that Plaintiff complained he had suggested on a disability form

Dr. Linden completed for her that "there is some exaggeration relative to" Plaintiff's ability to concentrate. (TR 633). Dr. Linden noted he had "clarified" this statement for her, but he did not indicate that his previous statement was mistakenly interpreted by Plaintiff.

In March 2009, Dr. Linden noted that Plaintiff "expresse[d] some underlying anger and irritability" but only toward her mother-in-law as she felt her mother-in-law did not appreciate the care Plaintiff was providing for her during her mother-in-law's "end-stage renal disease." (TR 634). In May 2009, Dr. Linden noted that Plaintiff was "fairly stable overall." (TR 636). In June 2009, Dr. Linden noted that Plaintiff was "notably distraught" and "anxious" and her mood was "dysphoric" because she was fearful that she might not obtain social security disability benefits. (TR 637). The majority of Dr. Linden's treatment records reflect that on mental status examinations of Plaintiff she persistently exhibited no acute psychotic symptoms, stable somatic functions, normal motor activity and sensorium, and a pleasant and cooperative demeanor. (TR 241, 480, 481, 487, 489, 490, 491, 495, 496, 498, 499, 624, 625, 626, 628, 629, 630, 631, 632, 633, 634, 635, 636).

The ALJ's decision reflects consideration of other medical evidence in the record, including the observations of other mental health professionals, Dr. Ozolins (as interpreted by Dr. Moorad) and Dr. Johnsen, and a neurosurgeon, Dr. Banowetz. In these physicians' reports of psychological and physical evaluations of Plaintiff, these physicians found that Plaintiff exaggerated her symptoms. (TR 21-22). The ALJ appropriately found that Dr. Linden's RFC assessment, to the extent the assessment found Plaintiff would be severely limited or unable to perform certain work-related functions, was not "consistent with the

overall evidence . . . ." (TR 24).      Plaintiff argues that the ALJ ignored "Dr. Johnsen's later abnormal findings." (Plaintiff's Opening Brief, at 20).  However, the record reflects that a social worker in Dr. Johnsen's office provided therapeutic pain management counseling for Plaintiff on eleven occasions in March, April, and May 2008. (TR 311-317).  The ALJ did not err by failing to evaluate these treatment notes as the opinion of Dr. Johnsen.

Plaintiff admits that her medical record contains repeated references to "malingering, exaggeration, somatization, persecution, and entitlement." Plaintiff's Opening Brief, at 14. Plaintiff, however, contends that there is no evidence Plaintiff did not actually experience pain to the extent she alleged.  The ALJ did not wholly reject Plaintiff's assertion that her physical impairments resulted in pain but assessed the credibility of Plaintiff's assertion that she was disabled due to pain and nonexertional limitations in light of the objective medical evidence. (TR 22-23).  This credibility determination does not conflict with the ALJ's finding that Dr. Linden's RFC assessment was entitled to some weight in light of inconsistencies between the RFC findings included in the assessment and Dr. Linden's treatment records and with other medical evidence in the record.

The ALJ appropriately determined that Dr. Linden's opinion was not consistent with his own treatment records and was not "consistent with the other substantial evidence in the record."    Pisciotta v. Astrue, 500 F.3d 1074, 1077 (10th Cir. 2007)(citing 20 C.F.R. §404.1527(d)(2) and Watkins, 350 F.3d at 1300).  The ALJ's decision not to give controlling weight to Dr. Linden's opinion is supported by substantial evidence, and no error occurred in this respect.

VI. Examining Physician's Opinions

In his decision, the ALJ recognized that Plaintiff had obtained written opinions by two physicians, Dr. Ellis and Dr. Bough, who examined her in connection with her workers' compensation claim. The ALJ correctly noted in the decision that neither Dr. Bough nor Dr. Ellis provided medical treatment or active care for Plaintiff and therefore were not treating physicians. (TR 24). As the ALJ found, "[r]ather, these physicians examined [Plaintiff] upon the referral of her attorney and rendered reports for evidentiary purposes" in her workers' compensation case. (TR 24).

The medical record contains a report of a physical examination of Plaintiff conducted by Dr. Blough in September 2008. (TR 643-651). Ten months later, Dr. Blough completed a written physical RFC assessment form that also appears in the record. (TR 640-642). In this assessment, Dr. Blough effectively finds that Plaintiff is unable to work.

In the ALJ's decision, the ALJ discussed Dr. Blough's opinion. The ALJ stated that Plaintiff

> was examined by Dr. Blough upon the referral of her attorney on September 9, 2008, for purposes of obtaining a [workers' compensation] rating of impairment. Dr. Blough found that claimant sustained multiple areas of permanent partial disability stemming from her on the job injury. Dr. Blough found the claimant was unable to perform her prior work and would be an excellent candidate for vocational rehabilitation. This strongly suggests that Dr. Blough found the claimant would be able to perform other types of work. Dr. Blough completed the form concerning his medical opinion of the [Plaintiff's] ability to do work-related activities on July 7, 2009. There is no evidence that he re-examined the claimant on that date, particularly in light of his reference to his previous report of September 9,

> 2008. He found the claimant was able to lift and/or carry twenty pounds occasionally and ten pounds frequently. He also found the claimant should have several occasional postural limitations. These findings are consistent with the determination of the claimant's residual functional capacity. As a non-treating medical source, the remaining findings have been given little weight or consideration as inconsistent with or not specified in his own previous medical assessment.

(TR 25).

Plaintiff first contends that the ALJ may have been expressing "possible bias on Dr. Blough's part" when the ALJ described the purpose for the September 2008 evaluation of Plaintiff. The ALJ correctly described the purpose of Dr. Blough's and Dr. Ellis's one-time examinations of Plaintiff. More significantly, however, Plaintiff makes no cogent legal argument that the ALJ actually rejected Dr. Blough's RFC assessment on the basis that Dr. Blough was somehow biased in favor of Plaintiff. Nothing in the ALJ's decision would support such an argument.

Because Dr. Blough was not a treating source, the physician's opinion was not entitled to "more weight" under the pertinent regulations. See 20 C.F.R. § 404.1527(d)(2). Dr. Blough's report was entitled to consideration as a medical source opinion, however, and Plaintiff contends that the ALJ erred by giving more weight to the opinions of the non-examining state agency medical consultants relative to the weight given to Dr. Blough's

opinion.[3]  Moreover, Plaintiff contends that the ALJ erred in evaluating the opinion of Dr.

Blough concerning Plaintiff's ability to perform work-related activities.

The ALJ recognized in his decision that a state agency medical consultant had

provided a written RFC assessment dated August 12, 2008, in which the consultant found

that Plaintiff was capable of performing light work with a limitation of the ability to only

occasionally stoop and that this assessment had been affirmed by a second medical

consultant. (TR 23)(citing TR 533-540, 571).  The ALJ stated that he had given this RFC

assessment "considerable weight as consistent with the treating medical records as well as

the overall evidence." (TR 23).

Plaintiff takes issues with the reasons provided by the ALJ for discounting Dr.

Blough's RFC assessment.  Plaintiff first suggests that the ALJ's reliance on Dr. Blough's

statement concerning vocational rehabilitation was "misplaced." Plaintiff's Opening Brief,

at 23.  However, Plaintiff does not make a cogent argument in support of this statement.  The

ALJ appropriately considered whether Dr. Blough's RFC assessment rendered ten months

later was consistent with his own report of his earlier physical examination of Plaintiff.  The

ALJ also appropriately considered the fact that Dr. Blough was not a treating physician.  The

---

[3]In her brief, Plaintiff makes a muddled argument that her "counsel" was unable to review Dr. Ozolin's actual report of this psychologist's evaluation of Plaintiff.  However, Plaintiff indicated to Dr. Linden in June 2009 that she had reviewed reports provided to the Social Security Administration and expressed concern that some of the examiners had "suggested that she might have been malingering." (TR 637).  Plaintiff does not contend that she was unable to provide a copy of Dr. Ozolin's report to her attorney if she had chosen to do so, nor does Plaintiff object to the interpretation of Dr. Ozolin's report made by Dr. Moorad. (TR 245-246). This argument therefore lacks merit.

ALJ logically and appropriately concluded that Dr. Blough's statement in his September 2008 report of his examination of Plaintiff that Plaintiff would be an excellent candidate for vocational rehabilitation reasonably suggested that she was capable of performing other work despite her physical and mental impairments.  Further, the ALJ recognized that some of the findings included in Dr. Blough's written RFC assessment were consistent with the ALJ's RFC finding. Specifically, as the ALJ recognized, Dr. Blough found that Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, and that Plaintiff would be able to only occasionally perform some postural movements. (TR 25, 640-641). However, Dr. Blough also found in his RFC assessment that Plaintiff would need to lie down two to three times a day "at unpredictable intervals during a work shift" and that she would be absent from work about three times a month. (TR 641-642).  The ALJ found that these "remaining findings," which would effectively preclude Plaintiff from performing any job, were given "little weight or consideration as inconsistent with or not specified in his own previous medical assessment." (TR 25).

The ALJ appropriately discounted Dr. Blough's RFC assessment because Dr. Blough had previously reported that Plaintiff would be an excellent candidate for vocational rehabilitation, even though she would not be able to perform her previous job, and the physician did not explain this discrepancy. (TR 650).  See Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987)(where a doctor's report consists solely of boxes checked on a form, the "evaluation forms standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence").

Although Plaintiff contends that the ALJ erred by failing to discuss several of Dr. Blough's objective findings during the one-time examination, Plaintiff does not suggest how the objective findings set forth in Dr. Blough's report of his September 2008 examination of Plaintiff supports Dr. Blough's later findings that Plaintiff would need to lie down two to three times during a work day or be absent from work three days a month.   No such correlation is evident from the record, and these RFC findings by Dr. Blough find no support in any other medical evidence in the record.   As the ALJ pointed out, Plaintiff's treating neurologist, Dr. Banowetz, specifically found that there was a "significant likelihood" that Plaintiff was malingering in light of her normal examination findings, including normal gait, normal strength and tone in her arms and legs, normal fine motor movements, and full reflexes. (TR 21, 464-465).   No error occurred in the ALJ's evaluation of Dr. Blough's RFC assessment.

VII. Step Four RFC Assessment and Step Five

In his decision, the ALJ found at step four that Plaintiff retained the capacity to perform light work[4] with occasional postural movements (climbing, balancing, stooping, kneeling, crouching, or crawling) and the ability to understand, remember, and carry out simple, routine, and repetitive tasks. (TR 19).   The ALJ further found that Plaintiff was capable of "respond[ing] appropriately to supervision, co-workers, the general public, and

---

[4]Light work is defined as work involving lifting objects weighing up to 20 pounds at a time, frequently lifting or carrying objects weighing up to 10 pounds, and mostly walking or standing, or sitting with pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

usual work situations." (TR 19).

In the ALJ's decision, the ALJ found at step three that Plaintiff's mental impairment due to an affective disorder had resulted in "moderate difficulties" in social functioning. (TR 18). The ALJ reasoned that Plaintiff "may prefer to remain at home; but she is able to maintain significant relationships with her family, including her husband and children, as well as with friends. She is able to shop in stores and attend her medical appointments. . . . Sometimes, she attends church services. All of these activities require social interaction." (TR 18). The ALJ also found that Plaintiff's mental impairment had resulted in "moderate difficulties" in concentration, persistence or pace. (TR 18). The ALJ reasoned that Plaintiff was "able to read books, read her [B]ible, and watch television. She is also able to watch and understand the television news. The claimant is able to pay bills, count change, handle a savings account, and use a checkbook and money orders. . . . The claimant is able to closely review and monitor her medical records; and she is able to request amendments and modifications from providers concerning details in records which she disputes. All of these activities require a threshold level of concentration." (TR 18).

Plaintiff contends that the ALJ erred in failing to include in the RFC finding any limitations resulting from her mental impairment. At Plaintiff's administrative hearing, the ALJ presented a hypothetical inquiry to the VE which incorporated the RFC assessment as found by the ALJ. In response to this questioning, the VE testified that such an individual could perform the light, unskilled jobs of bench assembler, photofinishing counter clerk, and furniture rental clerk. (TR 52-53). The VE further testified that an individual who could

perform the requirements of sedentary work with the same additional limitations and abilities could perform the sedentary, unskilled jobs of addresser, touchup screener, and order clerk. (TR 53-54).   Plaintiff has not alleged that any of these jobs required social functioning abilities or concentration abilities that are not consistent with the ALJ's step four RFC finding or with the ALJ's step three finding of moderate limitations in social functioning and in concentration, persistence, or pace.   The ALJ's decision includes an extensive discussion of the medical and non-medical evidence in connection with the RFC finding.   Given the multiple references in the record by treating and examining physicians to Plaintiff's persistent exaggeration of her physical and mental symptoms, and in light of the VE's testimony, there is substantial evidence in the record to support the ALJ's finding at step five that Plaintiff is not disabled within the meaning of the Social Security Act.

<u>RECOMMENDATION</u>

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING  the decision of the Commissioner to deny Plaintiff's application for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____ July 26th, 2012, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72.  The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991); <u>cf.</u> <u>Marshall v. Chater</u>, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this ____6th____ day of ____July____, 2012.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE